RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SARUBA ASANTE SMITH (25-5167); KHARI QUNARLL
SMITH (25-5259); CHANEL LASHAE LOGAN (25-5409),

*Defendants-Appellants.*

Nos. 25-5167/5259/5409

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:24-cr-00061-2—Danny C. Reeves, District Judge.

Decided and Filed:  July 29, 2026

Before:  MOORE, NALBANDIAN, and MATHIS, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Noah R. Friend, NOAH R. FRIEND LAW FIRM, PLLC, London, Kentucky, for
Appellant Saruba Smith.  C. Ransom Hudson, Cincinnati, Ohio, for Appellant Khari Smith.
Rhey Mills, BROOKE & MILLS, PLLC, Richmond, Kentucky for Appellant Chanel Logan.
Charles P. Wisdom, Jr., Amanda Harris Huang, UNITED STATES ATTORNEY'S OFFICE,
Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

NALBANDIAN, Circuit Judge.  Khari Smith enlisted Chanel Logan to deal drugs.
Logan then made two drug deals with her accomplice, Saruba Smith.[1]  But law enforcement

---

[1]Because Khari and Saruba share a last name (but are unrelated), we'll refer to them by their first names.

knew about the scheme from the start, and the government indicted the trio on drug charges. A jury convicted Saruba and Khari of aiding and abetting drug distribution. The jury also convicted Khari of using a phone to facilitate a drug offense, but acquitted Saruba of conspiracy to distribute drugs. The district court sentenced Saruba to 92 months' imprisonment. And it sentenced Khari to 150 months' imprisonment, to be served consecutively to his sentence in an unrelated federal case. Logan pleaded guilty to a drug-distribution conspiracy charge, and the district court sentenced her to 360 months' imprisonment. Logan, Khari, and Saruba bring various challenges to their convictions and sentences. For the following reasons, we AFFIRM Logan's sentence and conviction, AFFIRM Khari's sentence and conviction, and AFFIRM Saruba's conviction but VACATE her sentence and REMAND for resentencing.

## I.

This case began in county jail, where Khari awaited sentencing on unrelated federal drug charges. But that didn't deter him from conducting his business. He told his cellmate, David Sam, that he "knew somebody that had different drugs." R.135, Trial Tr. Vol. I, PageID 804. Sam replied that he "knew somebody who would buy" drugs. *Id.* It was a match. So Khari told Sam that they would "set something up." *Id.* at PageID 805. But Sam told his lawyer about the conversation and began cooperating with the DEA. The DEA gave Sam a phone number that belonged to an undercover detective who went by Jimmy. And Sam gave Jimmy's number to Khari. Sam told Khari that he'd sold large quantities of drugs to Jimmy in the past and that Jimmy was looking for another supplier now that Sam was in jail.

Khari took the bait and fulfilled his side of the deal. He called Logan from jail and gave her Jimmy's number. Logan was a drug dealer from Detroit, Michigan, but she leased an apartment in Lexington, Kentucky, where she spent time with her on-and-off girlfriend: Saruba. Khari coached Logan on what to say to Jimmy. He told her to tell Jimmy that she was "part of ATL's people" and that she was "looking to do business." R.136, Trial Tr. Vol. II, PageID 1012. ATL was Sam's street name. So Logan texted Jimmy and set up a call. Logan made it clear that she was moving volume. She boasted that she had a good supply of meth, and that she could get her hands on heroin or fentanyl, too. After some back-and-forth, Jimmy ordered an ounce of fentanyl and a pound of crystal meth, and Logan quoted a price.

The deal was in motion.  Jimmy met Logan and Saruba in a Lexington parking lot.  Logan told Jimmy to toss the money through her car window.  But Jimmy's aim wasn't true, and one of the wads of cash bounced off the roof of Logan's car.  Jimmy picked it up and threw it again.  The cash made it into the car this time.  Amid the commotion, Saruba (Logan's passenger) reached down to pick up the cash and handed it to Logan.[2]  Then came the return salvo:  Logan threw the drugs to Jimmy.  Jimmy recorded the deal on a body-worn camera.

Jimmy then arranged a second controlled buy.  Logan met him in another parking lot (this time without Saruba) and sold him two pounds of meth.

Things were going well for Logan—or so she thought.  Jimmy told her that he had cash for a large transaction.  So Logan and Saruba drove from Chicago, Illinois to Lexington, carrying meth and fentanyl.  But the police interdicted them.  Officers found about 15 pounds of meth and a few ounces of fentanyl in the car.  They arrested the pair, who lied about the details of their trip.  Back at the jail, Khari lamented to Sam that "his home girl got locked up coming from out of town" with a "bunch of [fentanyl] and a bunch of meth."  R.135, Trial Tr. Vol. I, PageID 807–08.

The police later searched Logan's apartment and found 11 kilograms of meth, another kilogram of a mixture containing meth, a kilogram of fentanyl, and 44 grams of a fentanyl analogue.  They also found a loaded pistol and indicia of large-scale drug trafficking:  a blender jar, a hydraulic press, and clear plastic baggies of fentanyl and meth.

The government indicted Logan, Khari, and Saruba on various drug charges.  Logan pleaded guilty to two charges:  conspiracy to distribute and possess with intent to distribute fentanyl and meth, and possession with intent to distribute the same.  The district court sentenced Logan to 360 months' imprisonment.

Khari and Saruba went to trial.  A jury convicted them of aiding and abetting the distribution of meth and fentanyl.[3]  The jury also convicted Khari of using a phone to facilitate a

---

[2]Although Saruba offered a different explanation at trial, she concedes on appeal that she reached down to pick up the cash.  Saruba Br. 35.

[3]This charge pertains to the first drug deal.

drug offense.  But it acquitted Saruba of conspiracy to distribute meth and fentanyl, and of possession with intent to distribute meth and fentanyl.  The district court sentenced Khari to 150 months' imprisonment, to be served consecutively to a 200-month sentence from an unrelated drug case.  And it sentenced Saruba to 92 months' imprisonment.

These appeals followed.

**A.**

Logan raises three challenges to her sentence.  First, she claims that the district court procedurally erred by impermissibly speculating about her criminal past at sentencing.  Second, she challenges the district court's application of a two-level "drug house" enhancement.  And third, she contends that her sentence was substantively unreasonable.  None of these challenges holds water.  We'll address each in turn.

**i.**

We'll start with Logan's claim that the district court procedurally erred by citing her "extensive criminal history." Logan Br. 13.  She takes issue with the district court's remarks that she was a "sly customer" who "knew her way around" drug dealing.  R.143, Logan Sent'g Tr., PageID 1487–88.  And she objects to the district court's observation that "it's fair with all the circumstantial evidence to conclude that this was not her first engagement in . . . illegal activities." *Id.* at PageID 1487.  On Logan's view, those statements rendered her sentence procedurally unreasonable because by relying on "improper information," the district court "imputed acts to [her] that never occurred." Logan Br. 15.  But she's wrong.

To begin, Logan didn't object on this ground at sentencing, so we review for plain error. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).  That means Logan must show "(1) error, (2) that was obvious or clear, (3) that affected [her] substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (citation modified).

A sentencing court's reliance on "materially false or unreliable" information can result in a procedurally unreasonable sentence. *United States v. Adams*, 873 F.3d 512, 517 (6th Cir.

2017).   And a defendant who challenges evidence on this basis must establish that (1) it's "materially false or unreliable," and (2) that "such false or unreliable information actually served as the basis for the sentence." *Id.* (citation modified).

But here, there's no error to speak of—much less a plain one.  Logan's argument falters because the district court's remarks weren't materially false or unreliable.  They were true and verifiable.  Take Logan's phone calls:  She assured Jimmy that she had high-quality drugs and told him that she was dealing drugs to other customers.  Consider the extent of her operation:  She used a hydraulic press to pack drugs and cutting agents to maximize profit.  And recall that Logan had no verifiable employment or legitimate income.

Given this evidence, the district court's observations were not materially false or unreliable.  Logan didn't just "kn[o]w her way around" drug dealing—she was a professional.  So the district court didn't err in relying on the record over Logan's unsupported assertions.  *See, e.g.*, *United States v. Messer*, 71 F.4th 452, 462 (6th Cir. 2023) ("[A]lthough [defendant] might disagree with the court's findings, they are permissible on the record before us, and so we have no reason to disturb them."); *United States v. Matthews*, 31 F.4th 436, 458 (6th Cir. 2022) (Defendant "points to no record evidence (other than assertions made, without record support, in his motion for a downward variance) showing that that factual finding was clearly erroneous."); *cf., e.g.*, *Adams*, 873 F.3d at 519 (district court erroneously relied on government's *unsupported* statements that drug dealers need 18 months to "reset" their brains).  And because Logan hasn't pointed to any "materially false or unreliable" information, *Adams*, 873 F.3d at 517, we needn't consider any effect on her sentence.

**ii.**

Next, we'll consider Logan's challenge to the two-level "drug house" enhancement.  On her view, the district court erroneously concluded that she used her Lexington apartment primarily for drug trafficking.  She makes a temporal argument:  She couldn't have used the apartment to *frequently* traffic drugs because "[t]he evidence shows only [three] months of the apartment being used for drug activity," and she wasn't present for most of March and April.

Logan Br. 19–20.  She also points out that "no drug transactions occurred on the property" during the surveillance period.  *Id.* at 20.  But we're not convinced.

When we review a challenge to the application of a sentencing enhancement to a particular defendant's facts, we review factual findings for clear error and the district court's interpretation of the Guidelines de novo.  *United States v. Taylor*, 85 F.4th 386, 388 (6th Cir. 2023).  When evaluating a challenge like Logan's, which centers on "the primary use prong of the drug-premises enhancement," we review de novo the enhancement's applicability.  *United States v. Florence*, 150 F.4th 773, 782 (6th Cir. 2025).

The Guidelines provide a two-level enhancement for defendants who "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12).  Drug manufacturing or distribution needn't be the "sole purpose for which the premises was maintained," but it must be a "primary or principal use[]" rather than an "incidental or collateral" one.  *Id.* § 2D1.1 cmt. n.17.  In this vein, we "consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently [it] was used by the defendant for lawful purposes."  *Id.*  We've clarified that the enhancement has a knowledge requirement.  *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).  And we've provided a few guideposts.  The "more the home looks like a business—due to the presence of, say, manufacturing equipment, cash, [and] weapons, . . . the more likely we are to uphold the district court's application of the enhancement." *United States v. Tripplet*, 112 F.4th 428, 432–33 (6th Cir. 2024) (citation modified); *see also United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) (upholding enhancement where defendant's house contained "tools of the trade," including a digital scale, drug-packaging materials, and police scanners).  We also consider the "sheer volume of drugs."  *Tripplet*, 112 F.4th at 433.

Logan's apartment qualifies as a drug house.  It was "sparsely furnished" and bore the indicia of large-scale drug trafficking.  R.143 at PageID 1444.  Officers found (among other things) a loaded handgun, nine pounds of meth, nearly two pounds of fentanyl, gloves, digital scales, sandwich bags, aluminum foil, a hydraulic press, and a blender jar.  That easily suffices. *Tripplet*, 112 F.4th at 433 ("[s]ubstantial quantities" of drugs "suggest a distribution hub," a gun

"may serve as protection," and evidence "dispersed throughout the residence" suggests a "significant portion of the living area [was] devoted to some aspect of drug dealing," particularly in the "kitchen [where] . . . things [were] made up for sale" (citation modified)).

Logan's responses, that she didn't traffic drugs for the entire duration of her lease and didn't reside in the apartment for portions of time, miss the mark. To be sure, the Guidelines commentary doesn't define frequency. *See* U.S.S.G. § 2D1.1 cmt. n.17. So, at first glance, the commentary could refer to the regularity of drug activity at the time of the investigation. Or it could reflect Logan's view that we should consider frequency over the time she maintained the premises—here, her lease term. But our cases reflect the first formulation. *See, e.g.*, *Bell*, 766 F.3d at 637 (considering the frequency of a defendant's drug manufacturing over a nearly two-year period where the defendant lived in his house for at least double that time); *United States v. Stokes*, 2024 WL 2106327, at *2 (6th Cir. May 10, 2024) (several controlled sales "over a few months" established frequency); *United States v. McFarland*, 2021 WL 7367157, at *8 (6th Cir. Oct. 4, 2021) (order) (applying enhancement to defendant who lived in her apartment for over seven years but stored drugs there for only one week). In any event, Logan loses on her own formulation. Putting aside her claim that she stumbled into high-volume drug trafficking late into her lease, we can credit evidence of an operation's sophistication despite the short duration of drug activity. *Tripplet*, 112 F.4th at 433 (noting that while four controlled buys (three in five weeks) don't of themselves indicate a drug house, "[s]ubstantial quantities" of drugs, as well as a gun, blenders, and cash dispersed throughout the residence suggest that "drug activity was a primary use of the space").

Logan's argument that the enhancement doesn't apply because "no drug transactions occurred on [her] property," Logan Br. 9, 20, fails for the same reason. What's "sufficient" in one case "is not always necessary" in another. *Bell*, 766 F.3d at 637. Here, the drugs and equipment found in Logan's apartment point to a manufacturing hub—not a distribution point. But the enhancement covers both uses, so it applies here. U.S.S.G. § 2D1.1(b)(12) (enhancement applies if premises used for "the purpose of manufacturing *or* distributing a controlled substance" (emphasis added)); *see Bell*, 766 F.3d at 637 (noting that "[d]rug storage on the property" and "circumstantial evidence showing drug production" typically suffice).

**iii.**

Finally, Logan contends that her sentence is substantively unreasonable. She makes three arguments. First, she points to the disparity between her sentence and her co-defendants' sentences. Second, she notes that her sentence exceeds the national average for drug traffickers. And third, she claims that the district court placed too much weight on deterrence. But we're not convinced.

A substantive-reasonableness challenge is a claim that a defendant's sentence is "too long" because the district court "placed too much weight on some of the [18 U.S.C.] § 3553(a) factors and too little on others." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). We apply a presumption of reasonableness to a within-Guidelines sentence. *United States v. Gardner*, 32 F.4th 504, 530 (6th Cir. 2022).

We review substantive-reasonableness challenges under an abuse-of-discretion standard. *Id.* A defendant needn't object to preserve this claim. *Id.*

Logan's within-Guidelines sentence is substantively reasonable. To start, her comparison to her co-defendants is misplaced. Section 3553(a)(6) tells sentencing courts to consider "*national* disparities between defendants with similar histories convicted of similar criminal conduct—not disparities between codefendants." *United States v. Glover*, 167 F.4th 417, 430 (6th Cir. 2026) (citation modified). And regardless, the district court had ample reason to impose a longer sentence. Logan pleaded guilty to conspiracy—so she was responsible for all the drugs seized in this case. And she was the linchpin of the operation. Khari and Saruba aided and abetted *her* drug dealing, not the other way around. *See id.* (recounting defendant's "leadership role" in explaining why his sentence exceeded that of his co-defendant).

That Logan's sentence exceeds the national average doesn't change things. The drug weights alone result in a Guidelines range well above what the average drug trafficker faces. But that doesn't mean that Logan's sentence is substantively unreasonable. It just means that Logan was a prolific drug trafficker. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (sentencing courts should avoid "*unwarranted* disparities . . . *not* those that are warranted"). And Logan's argument runs into another problem. Ordinarily, § 3553(a)(6) is an "improper

vehicle" for challenging a within-Guidelines sentence. *United States v. Hymes*, 19 F.4th 928, 937 (6th Cir. 2021) (citation modified). Why? Because the Guidelines already "address the statutory purpose of combatting disparity."[4] *Id.* So "[t]he very thing [Logan] presumably wants—a below-Guidelines sentence—is more likely to create disparities than eliminate them." *United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011).

Logan's claim that her sentence is substantively unreasonable because the district court placed too much weight on deterrence fares no better. The court briefly addressed both specific and general deterrence as being "important factor[s]" in Logan's case while analyzing all the § 3553(a) factors. R.143 at PageID 1490. The court did not abuse its discretion in doing so, *see Phinazee*, 515 F.3d at 515–16 (finding no error where district court considered general deterrence at sentencing), and it is "simply beyond the scope of this court's appellate review" to weigh the factors differently, *United States v. Frei*, 995 F.3d 561, 567–68 (6th Cir. 2021) (citation modified). We reject Logan's substantive-reasonableness challenges to her sentence.

**B.**

Khari raises one challenge to his conviction and two to his sentence. He claims that the evidence at trial wasn't sufficient to convict him. He contends that the district court erred by denying a mitigating-role reduction at sentencing. And he thinks that his sentence is substantively unreasonable. These challenges are meritless. We'll address each in turn.

**i.**

We'll start with Khari's sufficiency-of-the-evidence challenge. He claims that the evidence at trial didn't support his conviction for using a phone to facilitate a drug offense[5] because he "only passed on a [phone] number to have [Logan] feel . . . out" a drug deal. Khari Br. 7. So, he contends, he didn't knowingly facilitate a drug crime. And he notes

---

[4]Because a properly calculated Guidelines range already accounts for national sentencing disparities, district courts needn't "elevate the [Sentencing] Commission's statistical data over the text of the Guidelines themselves." *Hymes*, 19 F.4th at 936.

[5]Khari didn't raise his aiding-and-abetting conviction in his initial brief. So he forfeited any challenge to that conviction, and we decline to address it here. *See Glennborough Homeowners Ass'n v. USPS*, 21 F.4th 410, 414 (6th Cir. 2021).

that the "only evidence" that he "may have been trying to arrange a drug transaction" came from an unreliable witness (Sam) who couldn't have known his intentions.  *Id.* at 8.  But we're not convinced.

21 U.S.C. § 843(b) criminalizes the "knowing or intentional use of any communication facility in committing or in causing or facilitating the commission of . . . a felony." *United States v. McLernon*, 746 F.2d 1098, 1106 (6th Cir. 1984) (citation modified).   The statute's state-of-mind requirement applies to a defendant's use of a phone.  *United States v. Burns*, 298 F.3d 523, 538 (6th Cir. 2002) ("[T]he government must establish that [defendant] (1) knowingly and intentionally used a communication[] facility (2) to facilitate the commission of a federal narcotics crime." (citation modified)).  And that use "need only facilitate (that is, 'make easier') the underlying drug felony."  *United States v. Wheat*, 988 F.3d 299, 312 (6th Cir. 2021) (quoting *McLernon*, 746 F.2d at 1106).  But we've also suggested that a knowledge requirement applies to the facilitation element.  *See id.* at 313 ("A rational jury . . . could find that [defendant] *knowingly* used his phone to make it easier to distribute [drugs]." (emphasis added)).

We review sufficiency-of-the-evidence claims de novo.  *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011).  "The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (citation modified).  We don't "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* (citation modified) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

Khari's sufficiency-of-the-evidence challenge fails.   He doesn't dispute that he intentionally used his phone to give Logan the phone number of a purported drug buyer, but he contends that he didn't knowingly facilitate the drug deal.[6]  We're not convinced.  Khari told

---

[6]Neither the indictment nor the judgment indicates the specific drug trafficking offense that Khari facilitated.   But we've said that a "felony drug offense" can be a conspiracy, and we've upheld facilitation convictions where one defendant facilitated another's felony drug offense.  *See Wheat*, 988 F.3d at 312 ("[T]he underlying drug felony can be a conspiracy or attempt."); *McLernon*, 746 F.2d at 1106 ("It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution.").  So at minimum, Logan's conspiracy conviction could serve as the felony drug offense.

Sam that he had a drug supplier and told him to "set something up." R.135 at PageID 804–05. Then he used his phone to contact Logan and set up the deal. And when Logan asked him what to say, he said, "[j]ust say it's ATL's people." R.136 at PageID 908. On these facts, we have no trouble concluding that Khari used his phone to facilitate the drug deal with full knowledge of the consequences. *See Wheat*, 988 F.3d at 313 ("[p]lenty of evidence" supported a conviction where defendant used his phone to "arrange[] for a meeting" to exchange a drug sample and attempt a larger sale). Khari's retort that Sam's testimony is unreliable doesn't move the needle. That goes to witness credibility, not to evidentiary sufficiency. And we don't "assess the credibility of the witnesses[] or substitute our judgment for that of the jury." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (citation modified).

**ii.**

Turning to Khari's sentence, we'll first consider his mitigating-role challenge. He claims that his Guidelines range should've been lower because his role in the drug deal was "minimal, minor, or intermediate." Khari Br. 9. So he thinks the district court erred in denying a reduction by relying on his indispensability to the drug deal. In support, he claims he didn't plan the sale and didn't "know anything had taken place until not long before he was arrested." *Id.* at 10. And he characterizes his instruction to Logan to speak with Jimmy as a vague suggestion to simply feel things out—perhaps to do nothing. But again, we're not convinced.

Under the Guidelines, a defendant is entitled to a four-level decrease in his offense level if he was a "minimal participant in any criminal activity," a two-level decrease for "minor" participation, or a three-level decrease if his participation fell between minimal and minor. U.S.S.G. § 3B1.2. The mitigating-role analysis is "heavily dependent upon the facts of the particular case." *Id.* § 3B1.2 cmt. n.3(c). A district court considers the defendant's understanding of the "scope and structure of the criminal activity," his involvement in "planning or organizing," the degree to which he exercised "decision-making authority," the "nature and extent" of his "participation," and "the degree to which the defendant stood to benefit." *Id.* A role reduction "is warranted only if [a defendant's] role in committing the criminal offense was such that he is substantially less culpable than the average participant in the crime." *United States v. Guerrero*, 76 F.4th 519, 533 (6th Cir. 2023) (citation modified).

We review the denial of a mitigating-role reduction for clear error. *United States v. Mosley*, 53 F.4th 947, 963 (6th Cir. 2022). So "the district court has a wide berth in resolving the matter." *Id.* (citing *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010)).

Khari isn't entitled to a mitigating-role reduction. He brokered the drug deal by putting Sam in touch with Logan—and he even conceded that he was the "key to setting it up." R.139, Khari Sent'g Tr., PageID 1333. So Khari necessarily planned and organized the drug deal—at least to a "minimal" extent. *Id.* at PageID 1338. And by identifying Logan as a large-scale dealer, he showed he understood the structure of the criminal activity. Finally, he participated in the drug deal by "set[ting] up the call for the transaction that actually gave rise to the drugs being transferred." *Id.* True, as the district court noted, there's "no evidence" of how he exercised decision-making authority—at least beyond his instructions to Logan. *See generally id.* And it's unclear how he stood to benefit from the deal. But because the mitigating-role inquiry is highly case-dependent, *see* U.S.S.G. § 3B1.2 cmt. n.3(C), we don't demand that defendants satisfy every factor. *See, e.g.*, *Mosley*, 53 F.4th at 963 (denying reduction despite lack of evidence as to defendant's organizational knowledge because the evidence "demonstrated [defendant's] involvement" in planning drug sales and his "authority to initiate each deal"). Here, Khari hasn't shown that he's "substantially less culpable" than the average participant. *Guerrero*, 76 F.4th at 533 (citation modified). And though the district court didn't directly address Khari's argument that his communication with Logan was merely an instruction to feel things out, it implicitly rejected that framing by recounting Khari's knowledge of the criminal activity.

Khari counters that the district court erred by relying too heavily on the "indispensable" nature of his participation. Khari Br. 10 (citation modified). But it didn't, so this argument fails. The Guidelines commentary explains that a defendant's "essential or indispensable role" in the conduct is "not determinative." U.S.S.G. § 3B1.2 cmt. n.3(C); *see also United States v. Ednie*, 707 F. App'x 366, 371 (6th Cir. 2017) (treating a defendant's indispensability as dispositive constitutes "legal error"). At sentencing, the district court acknowledged that "there is a situation . . . where a person can perform an . . . indispensable role . . . and still be entitled to a role reduction." R.139 at PageID 1337–38. But it concluded that Khari's case wasn't such a situation because Khari planned the drug deal, understood the nature of the activity, and

participated by setting up the call. Rather than relying on indispensability, the district court *disclaimed* it and analyzed the appropriate factors. So it didn't err in denying a mitigating-role reduction.

**iii.**

Finally, we'll address Khari's claim that the sum of his consecutive sentences across his cases—350 months' imprisonment—is "excessive" and "far exceeds the goals for sentencing." Khari Br. 14. On his view, the district court erred by denying his motion for a downward variance. We disagree.

First, a note on the standard of review. Khari couches his claim as a substantive-reasonableness challenge—which is a claim that his sentence is "too long." *Rayyan*, 885 F.3d at 442. We review substantive-reasonableness challenges under an abuse-of-discretion standard regardless of whether a defendant objects at sentencing. *Gardner*, 32 F.4th at 530. But the nature of Khari's claim isn't obvious. We've noted that "[a] challenge to a court's decision to impose a consecutive or a concurrent sentence is not easily classified as substantive or procedural." *United States v. Morris*, 71 F.4th 475, 482 (6th Cir. 2023) (citation modified).

Thankfully, we've built some guideposts for resolving consecutive-sentence claims regardless of how we characterize them. We "require a sentencing court to make generally clear the rationale under which it has imposed the consecutive sentence." *United States v. Sears*, 32 F.4th 569, 576 (6th Cir. 2022) (citation modified); *see also Morris*, 71 F.4th at 482 ("No matter how the challenge is characterized, a consecutive sentence is unreasonable if the district court fails to adequately explain why the sentence is consecutive." (citation modified)). But we don't require district courts to conduct separate § 3553(a) analyses for the "concurrent or consecutive nature of the sentence"—that would be "repetitious and unwarranted." *United States v. Mitchell*, 107 F.4th 534, 547 (6th Cir. 2024) (citation modified); *see also United States v. Brown*, 131 F.4th 337, 349 (6th Cir. 2025) ("We don't make [district courts] repeat the § 3553(a) analysis when deciding to impose a consecutive sentence."). And district courts don't abuse their discretion when they impose a consecutive sentence "seek[ing] to ensure an appropriate

incremental penalty for the instant offense." *United States v. Johnson*, 553 F.3d 990, 998 (6th Cir. 2009) (citation modified).

Khari's claim fails because the district court adequately explained its imposition of a consecutive sentence. It reasoned that "this sentence should run consecutively based upon [Khari's] knowing actions while . . . subject to penalties in the earlier case." R.139 at PageID 1363. And it explained that even a "partially concurrent" sentence "would unduly depreciate the seriousness of [Khari's] conduct in this matter." *Id.* The district court "made its consecutive-versus-concurrent decision alongside its § 3553(a) analysis" and "provided a rationale for why it . . . impose[d] the sentences consecutively"—"[o]ur precedent requires no more." *Brown*, 131 F.4th at 349–50.

### C.

Saruba raises three challenges to her conviction and two challenges to her sentence. As to her conviction, she contends that the district court's questioning of her at the end of her trial testimony violated Federal Rule of Evidence 605 and her right to a fair trial. And she claims that there wasn't sufficient evidence to convict her of aiding and abetting a drug transaction. As to her sentence, she argues that the district court procedurally erred by failing to apply a two-level reduction, and that her sentence is substantively unreasonable. Saruba's challenges to her conviction are meritless. But we agree that the district court procedurally erred in calculating her Guidelines range. So we needn't consider her substantive-reasonableness challenge because she'll be resentenced.

### i.

We'll start with Saruba's Rule 605 and fair-trial claims.[7] These challenges arise from Saruba's testimony that she thought that she and Logan were merely getting Starbucks when they met Jimmy for the first controlled buy. Saruba and Logan traveled across town to complete the deal, and the district court asked whether Saruba understood that there are a "number of Starbucks" locations between Logan's Lexington apartment and the parking lot where the deal

---

[7]Saruba blends these theories into a single claim, but they're better understood as two claims because they rest on distinct theories (and implicate different standards of review).

took place. R.137, Trial Tr. Vol. III, PageID 1186. Saruba responded that she was "not familiar with Lexington" and "didn't look up the place." *Id.* at 1185–86.

Saruba contends that this set of clarifying questions from the district court tainted her trial in two ways. First, she argues that the questions violated the Rules of Evidence because the district court testified as a witness and undermined her credibility. And second, she argues that the district court violated her due-process rights by creating the impression of bias against her. But these challenges miss the mark. We'll first consider the Rule 605 theory, then the due-process theory.

Federal Rule of Evidence 605 prohibits presiding judges from "testify[ing] as a witness at the trial." This is a rule of broad incompetency,[8] and a defendant needn't object to preserve this challenge. Fed. R. Evid. 605. We review Rule 605 claims de novo. *United States v. Valentine*, 70 F. App'x 314, 324 (6th Cir. 2003) (explaining that de novo review applies because Rule 605 states that no objection is necessary), *abrogated on other grounds by United States v. Camacho-Arellano*, 614 F.3d 244, 248 (6th Cir. 2010). But we then consider whether any error was harmless.[9] *Id.* at 325. An error is harmless if it doesn't affect a defendant's "substantial rights." Fed. R. Crim. P. 52(a); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) ("To affect substantial rights, an error must have substantial and injurious effect or influence in determining the verdict." (citation modified)). And under Federal Rule of Criminal Procedure 52(a), the government bears the burden of showing harmlessness. *United States v. Davila*, 569 U.S. 597, 607 (2013).

Here, the district court's clarifying questions ran afoul of Rule 605. To be sure, a district court can make statements based on the record or reasonable inferences from the record. *United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007) (district court's "statement that

---

[8]A district court "may examine a witness" so long as this examination doesn't veer into testimony *by* the district court. Fed. R. Evid. 614(b); *see United States v. Blanchard*, 542 F.3d 1133, 1148 (7th Cir. 2008) ("Although a district court may facilitate the jury's understanding of the case by questioning witnesses and explaining, summarizing, and commenting on the evidence, it is improper for the judge to add to the evidence by assuming the role of a witness." (citation modified)).

[9]We haven't previously applied a substantial-rights harmlessness analysis to Rule 605 error in a published decision, but we do so now. *See also United States v. Andasola*, 13 F.4th 1011, 1017 n.6 (10th Cir. 2021) (joining the Seventh and Ninth Circuits in applying this standard).

there would be little traffic on the road at 10:30 at night could be reasonably inferred from the officers' testimony that the road was in a remote area" because "[a] judge may make reasonable inferences from the record in summing up the evidence"). But a court cannot make statements based on "personal conjecture" or "his own observations." *Id.* (district court could not make statements about the locations of stop signs along a road with which he was personally familiar). This includes introducing new evidence through leading questions. *See Tyler v. Swenson*, 427 F.2d 412, 416 (8th Cir. 1970).

The district court's questions built on two things in the record: (1) the location of Logan's apartment, and (2) the location of the parking lot where the first controlled buy took place. But what the court specifically said regarding the number of Starbucks locations along the route and the fact that Lexington offered several more convenient Starbucks options was not in the record. There's no record evidence on the number of Starbucks cafes between Logan's apartment and the parking lot. And there's no record evidence on their locations or whether any of them fell along the route.

Nor could the court's observations be inferred from the record evidence. Instead, the court's observations were necessarily based on the judge's own personal observations of the relevant area. And that was improper.

But the error was harmless because the district court's questioning didn't affect Saruba's substantial rights. At trial, the government focused on its strongest evidence: that Saruba was caught on video during the first drug deal reaching down to pick up Jimmy's cash and handing it to Logan. What's more, the district court later instructed the jury that its "comments and questions are not evidence." R.138, Trial Tr. Vol. IV, PageID 1219. Under the circumstances presented here, the instruction cured any "conceivable prejudice." *United States v. Smith*, 831 F.2d 657, 664 (6th Cir. 1987).

The district court's questioning didn't violate Saruba's right to a fair trial, either. The Due Process Clause requires that parties be given "a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (citation modified). Judicial remarks that "reveal such

a high degree of favoritism or antagonism as to make fair judgment impossible" support a bias challenge. *Liteky v. United States*, 510 U.S. 540, 555 (1994). But remarks that "are critical or disapproving of, or even hostile to . . . the parties, . . . ordinarily do not support a bias or partiality challenge." *Id.*

Saruba didn't preserve this claim, so we review for plain error. *United States v. Owens*, 159 F.3d 221, 227 (6th Cir. 1998) ("If not properly preserved, this court reviews charges of judicial bias for plain error."); *see also Craddock v. FedEx Corp. Servs., Inc.*, 102 F.4th 832, 842 (6th Cir. 2024) (where "the conduct of the trial judge must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt" that left it unable to perform its role, "such conduct amount[s] to plain error" (citation modified)).

But there's no plain error here. The district court didn't show "deep-seated favoritism or antagonism." *Liteky*, 510 U.S. at 555. True, the district court implicitly cast doubt on Saruba's stated reason for traveling across town. But its short series of questions didn't deprive Saruba of her right to a fair trial—not least because it instructed the jury that its "comments and questions are not evidence." R.138 at PageID 1219; *see, e.g.*, *United States v. Evans*, 994 F.2d 317, 323–25 (7th Cir. 1993) (district court's "skeptic[al]" questions posed to defendant who denied that police officers told him they seized his gun didn't convey any bias to the jury because the district court instructed the jury that it may disregard the questions).

**ii.**

Next, we'll turn to Saruba's sufficiency-of-the-evidence challenge. On her view, the government didn't prove that she aided and abetted a drug deal because "[t]here was no evidence that she was involved in planning the transaction[], and no evidence that she received any benefit therefrom." Saruba Br. 34–35. And she downplays her retrieval of the money by noting that "the undercover officer dropped the money directly into the passenger side of the vehicle." *Id.* at 35.

Any person "who furthers—more specifically, who 'aids, abets, counsels, commands, induces, or procures'—the commission of a federal offense 'is punishable as a principal.'" *Rosemond v. United* States, 572 U.S. 65, 70 (2014) (quoting 18 U.S.C. § 2). "To prove that a

defendant aided and abetted drug transactions, the government must establish that [she] participated in the venture as something [she] wished to bring about and sought to make succeed." *United States v. Sadler*, 24 F.4th 515, 544 (6th Cir. 2022) (citation modified).

Saruba's sufficiency-of-the-evidence challenge fails.  Ample evidence supports the jury's conclusion that she aided and abetted the first controlled deal.  She sat in the passenger seat of Logan's car—closest to Jimmy—throughout the transaction.  She listened to Logan and Jimmy discuss drug quantities and payment.  And when Jimmy threw cash into Logan's car, Saruba bent down to look for it, picked it up, and handed it to Logan—thereby consummating the deal.[10] That suffices.  *United States v. Torres-Ramos*, 536 F.3d 542, 556–57 (6th Cir. 2008) (rejecting defendants' sufficiency-of-the-evidence challenge, in which they argued that "their mere presence at the location where the van was parked d[id] not support" their participation in a drug trafficking conspiracy where the government introduced evidence of defendants' behavior at the sites of drug deals); *United States v. Valdez*, 611 F. App'x 330, 334–35 (6th Cir. 2015) (government's evidence that defendant "was present at . . . two meetings that were supposed to result in the purchase of [drugs]" sufficed to sustain a drug-conspiracy conviction); *United States v. Gaspar*, 394 F. App'x 259, 263 (6th Cir. 2010) ("[W]e have held that the exhibition of suspicious behavior near the scene of a drug transaction can be sufficient circumstantial evidence to support" an aiding-and-abetting conviction. (citing *Torres-Ramos*, 536 F.3d at 557)).

**iii.**

Saruba also contends that the district court erred by failing to apply a two-level reduction to her base offense level.  She's correct.  A drug defendant whose base offense level is 32 and who receives a mitigating-role reduction under U.S.S.G. § 3B1.2 is entitled to a two-level reduction in the offense level.  U.S.S.G. § 2D1.1(a)(5).  The district court granted Saruba's request for a role reduction under § 3B1.2 but didn't reduce her offense level under § 2D1.1(a)(5).

---

[10]Although Saruba claimed at trial that she bent down to grab her phone from the side of the seat, she abandons this characterization on appeal and concedes that she picked up the money.  Saruba Br. 35.  Of course, the jury could've reached the same conclusion from the video alone.  It saw her bend toward the door—*exactly* where the money had landed—then hand something to Logan.

Because Saruba didn't object to this procedural defect, we review for plain error. That means she must show "(1) error, (2) that was obvious or clear, (3) that affected [her] substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Vonner*, 516 F.3d at 386 (citation modified).

The district court plainly erred.[11] The Supreme Court "has resolved the third and fourth prongs" of the plain-error inquiry in Guidelines-calculation cases—at least where the district court doesn't indicate that it would've arrived at the same sentence anyway. *United States v. Cavazos*, 950 F.3d 329, 334 (6th Cir. 2020); *see Molina-Martinez v. United States*, 578 U.S. 189, 199, 201 (2016) ("A district court that improperly calculates a defendant's Guidelines range . . . has committed a significant procedural error" that "in most instances will suffice to show an effect on the defendant's substantial rights" absent record evidence "as to what the district court might have done had it considered the correct Guidelines range." (citation modified)). Here, nothing in the record suggests that the district court would've arrived at the same sentence had it correctly calculated the Guidelines range. So "we are left to determine only whether the district court's [improper calculation] was an obvious or clear error." *Cavazos*, 950 F.3d at 334. It was. For defendants with a base offense level of 32, the Guidelines instruct district courts to "decrease [the base offense level] by 2 levels" if "the defendant receives a [mitigating-role] adjustment." U.S.S.G. § 2D1.1(a)(5). That's an unambiguous instruction, so the district court's failure to heed it was an obvious error. Saruba's sentence must be vacated, and she must be resentenced.

**iv.**

Finally, Saruba challenges her sentence as substantively unreasonable. But we decline to address her substantive-reasonableness claim because "we cannot prospectively rule on the substantive reasonableness of [her] new sentence, nor do we have reason to rule on the substantive reasonableness of [her] vacated sentence." *United States v. Davison*, 766 F. App'x 232, 235 n.1 (6th Cir. 2019).

---

[11]The government agrees and asks us to remand for resentencing.

**III.**

For these reasons, we AFFIRM Logan's sentence and conviction, AFFIRM Khari's sentence and conviction, and AFFIRM Saruba's conviction but VACATE her sentence and REMAND for resentencing.